Case Numbers 23-1847, 23-1855, 24-1068, and 24-1116 HRT Enterprises v. City of Detroit MI Oral Argument is not to exceed 25 minutes per side. Mary Mazuron for the appellant, you may proceed. And good morning. And I recognize we have appeals and we have cross appeals. We have the appeal and cross appeal of the judgment for HRT and then we also have the attorney fees appeal. We've granted 25 minutes each side. I think the court's preference would be to divide the arguments for the appeal of the judgment and the cross appeal for the judgment separate from the attorney fees appeal. And I guess I propose that maybe we have 15 minutes of argument for the appeal and cross appeal of the judgment and 10 minutes for the attorney fees. Is that acceptable to counsel or do you propose something else? Is that all right? So then we separate them out. So let's have arguments first about the judgment and the cross appeal as the judgment and then we'll hear the arguments about the attorney fees. All right. Yes, Your Honor. All right, you may proceed. May it please the court, Mary Mazuron on behalf of the City of Detroit, I would like to reserve eight minutes for rebuttal. Now I suppose if we're going to split everything, we'll need to change that. So I would reserve six minutes for rebuttal on the main and two minutes on the attorney fees.  Very well. As Michigan state courts correctly found, HRT never showed that the city took its property, which is why the state court 2002 suit resulted in a jury verdict rejecting the takings claim and the state court's 2005 suit was dismissed because HRT offered no material facts showing a taking. The absence of proof of city action to take the property requires reversal of the judgment. And this- May I ask, they allege that the taking occurred on January 1st, 2009 in federal court. That's what they allege. How can the 2005 decision have preclusive effect? Well, merely the 2005 can have preclusive effect because what you're looking at are the same material facts to claim there was a taking. In other words, nothing new that the city did vis-a-vis this property after 2005 changed the circumstances, which were already addressed by the state courts. How do you account for, and this sort of goes to the trial, how do you account for, I think the city expert witness said that there was a decrease in the property value from $3 million at around 2005 to I think $1.5 million by 2010. How is that accounted for? What the record shows, and I think it's apparent, is this was a time when the city was losing businesses right and left, its population base was losing, it was on the verge of bankruptcy, which it ended up going into in the middle of this case. During that time, the steel industry was in a free fall. Many of the customers for the business that was operating on the property were in bankruptcy. There's testimony in the record to that effect. And all of that resulted in the tenants leaving at their choice. But the city didn't cause the economic recession, and while the blight occurred in the city, it wasn't something the city was doing directed toward this property because it was trying to reduce the values so that it could take it at a later date. And that's what the cases from this court and the Supreme Court have said. If you're even going to accept a theory of taking by blight, you still have to show that the city abused the eminent domain process by directing actions to lower the value of the property in the hope of taking it down the road. And that's just absent from this record. Let me ask you about, so you have the 2005 decision, then you have 2008 they file in federal court, 2009 the state court kicks it on res judicata, right? Is that decision, the district court said that wasn't entitled to preclusive effect. Is it or is it not? If it is, why? It is entitled to preclusive effect. The district court said that's a mere procedural ruling, and I don't believe Michigan law supports that statement by the district court. What in Michigan law? I should have the cases at the ready, I apologize. But the test for taking, Michigan law treats a res judicata ruling as a substantive ruling. And what's your best case for that? I'll try to find it by rebuttal, I apologize. And just to follow up to that question is, then they argue, HRT says, well, you're putting us in a trap because we had to go to state court pursuant to Williamson County, but we came back, as we are entitled to do, to assert our federal claim, and then you give it res judicata effect under San Remo. Res judicata, as your friend on the other side points out, has an exception for manifest injustice. So assume you're right, the 2009 decision's entitled to preclusive effect. Res judicata has an exception for public policy or manifest injustice. Why isn't this situation created by Williamson County that forced them to go to state court such an injustice? That exception is exceedingly narrow, and this court in Westwood Chemical refused to apply it. The U.S. v. LaFatche case is, I think, the only case from this court that's applied that exception, and that was different because the court was in possession of $50,000, and so then the problem was, well, what are we going to do with this money if we say res judicata applies? We don't have any way to figure that out. In San Remo, the Supreme Court told us, even in the wake of Williamson and Nick, that res judicata principles continue to apply. San Remo preceded Nick, right? I'm sorry. My mistake. Am I right? I think I am. But I could be wrong. I thought Nick was 2019. Yeah. I have that backwards. I apologize. Okay. Go ahead. Sorry. Nick noted the exhaustion requirement led to unanticipated consequences, so it did away with the Williamson rule, but no Michigan court has said we're going to apply this policy to any case in which res judicata might have had an impact on cases that were required to go to state court. I'm not aware of any decision from this court that has done that, and San Remo specifically said when Williamson was in effect, if I'm correctly understanding those cases, that the statute still governed and that the federal courts have to apply Michigan preclusion law, and that makes sense because it's a matter of respect between the sovereign courts. After all, when the plaintiff was told, hey, you have to go to state court, and I understand that's no longer the rule, the plaintiff could easily have raised the federal claims along with the state claims to avoid that, of course, had it done so. But they did raise federal claims. Not in the state court. They said we reserve our rights under England. We're going to raise our state taking claim. And then we'll go back and get a second bite of the apple in federal court, and the problem with that is it creates a huge tension between the state and federal courts, which is what the statute is intended to avoid. All right. You admit that the facts changed between 2005 and 2009, I guess it is, but you claim that it wasn't the city's actions that changed the facts? Is that the argument? Yeah, let me, if I could, elaborate a little bit on that. Judge Cohn listed 14 events to say, hey, everything is different. I can do what I want here. But if you go down that list, the last tenant went out of business and left in 2008, well, of course, that was after the jury trial, but that was not anything the city did. Property was looted by vandals. Just to answer my question, that's your argument, is you admit that the facts have changed significantly since 2005, but you're just saying it wasn't our fault, we didn't do it, that therefore we still should apply raised judicata, right? No, I'm saying the material facts have not changed. And so there were events in the world that occurred between 2005 and 2008, but no events that would change the takings analysis. Can I give you a hypo-related to Judge Griffin's question, assume for the sake of argument that all the facts changed, material facts, all facts changed between 2005 and 2009. Go to state court. State court says, we disagree. We are applying raised judicata. Does the federal court in that instance have to apply raised judicata or can they say the state court got it wrong? All the facts are different. Assume there's material factual changes. They allege them in their 2008 complaint. They go to state court. They allege them there. State court says, we disagree. We're looking at your facts. We disagree. Raised judicata, which is what they did here. This is exactly this case. Now we come back and Judge Cone, I think it was Judge Cone at the time, says, I disagree. Facts are different. I don't have to give preclusive effect to that decision. Right or wrong is a matter of law. Does he have to give preclusive effect or can he revisit it? I think the test for raised judicata looks to whether the actions arise out of the same nucleus of facts. The state court concludes they do. That's what happened. If the state court concludes they do, I think it is. Before you raise the raised judicata argument, you raise the issue of rightness or finality. I think the argument is that the decision's not final because the city has never officially condemned the property. But if that's the standard, could you ever have a de facto taking or an inverse condemnation? If that's what the rule is? You could. Okay. How could you then? And the circumstance in which the courts have recognized that in the past have been circumstances involving physical intrusions. And in those circumstances, on fairly rare occasions, the courts have said that even though the government hasn't done something directly, that's immediately taken the property. Do you limit those doctrines of de facto taking and inverse condemnation to physical intrusions? Is that what you say those doctrines are limited to? Right. And what I would go back to here has to do with the decision. This court in Sayre and in Westwood, but Sayre in particular, made the point. And this is a point that's consistent with the U.S. Supreme Court's decision in Danforth. What they said was, you can have plans. Danforth even said you can pass a law. But the money hasn't been appropriated, so that's not ripe for a decision. If you think about the torturous history, protracted history of this case, and if you look at all of the problems that were created by Judge Cohn in our view's erroneous ruling with respect to even, well, if there was a taking, what was the taking? When did the taking occur? I just want to, I think it sounded like your answer to Judge Griffin's question was that there has to be some physical intrusion before an inverse condemnation claim is ripe. And I guess I don't understand how would that work when there's a regulatory taking. That seems to suggest that regulatory takings can never be ripe. Well, let me see if I can clarify. I don't think I said that very clearly. What this court said in Sayre and what the U.S. Supreme Court said in Danforth had to, arose in the context of a regulatory taking. And in the context of a regulatory taking, what the courts have said repeatedly is there has to be a final decision. And unless you get to the point of a final decision, the regulatory taking is not ripe. What do you mean by a final decision? Well, in this case, it would be the government coming in to issue, notify eminent domain. That's a physical taking. That's not inverse condemnation, which is what this case is. So again, it seems like you're saying inverse condemnation claims can never be ripe under a regulatory takings theory. If you had the passing of a law that had, where the effect was imminent and clear, then even absent a decision to condemn, there are cases that say it's ripe. But here, what you have are airport planning layouts, which Watts testified without contradiction, amount to a wish list. You put in anything you think you might want in your plan. And in fact, in 2010, before this case was moving along, a letter was sent saying, you know, we're not building a replacement runway. We're not building it. We're not asking for funding. It's not in our plan. And that was there. So you have a very preliminary hope, wish statement. That's not enough. It seems like you're acknowledging you can have a de facto taking, but the facts here just don't support it. The courts have found, for instance, in United States v. Dickerson, Justice Frankfurter was looking at dam construction, construction of a dam that was going to cause permanent flooding. And the court said that was a taking, even though the government didn't condemn this property, because it left, it constructed the dam, and it was clear that the dam was going to result in flooding, which would deprive the property owner of his property. So there are cases like that. But this case doesn't fall in that category. This case falls in the huge category that says when governments plan for the future and their plans are speculative, they don't have the funds, when public officials or officers announce with a fanfare, you know, we're going to do this, we're going to do that, those announcements often don't come to fruition. And you can see that with the city airport, because multiple different administrations have all sorts of grandiose plans for the city airport, which is currently not operating, because the money was never there. The approvals were never there. And consequently, courts have uniformly said, those kinds of plans aren't enough for a taking. I mean, you could view that through the lens of ripeness. You could view that through the lens of there is no taking. I think if you follow both those routes in this case, you get to the same place. Okay. Do you want to address their cross-appeal while you're up here? Judge Cohn reduced the jury verdict from 3 million to 2 million. Correct, correct. And he did so because the only testimony supporting it was Carl Thomas's, and Carl Thomas's testimony included no foundation, and in fact his answers to questions about whether he even knew the value of the two neighboring commercial properties, he did not, showed that there was no foundation. I see my light is on. What we've tried to argue with respect to that is Judge Cohn properly could conclude there was no record evidence about what the value was that would take it above 2 million. Brother Counsel wants to say, well, what about this other testimony? How did Judge Cohn get the $2 million figure? It came pretty close to what the jury found in the second trial. I know that, so it kind of shows that he had a good idea, but I don't think an expert testified that the value was 2 million. No, that's correct. How he got there was he looked at the two experts' testimony. The expert who said 3 million, he noted that that expert had not taken into account at all the factor of the enormous economic decline and property value decline in the city generally, and based on that he came to the number he selected. Okay. All right. You'll have some rebuttal for the appeal of the judgment.  Good morning. Good morning. Mark Gonzaga, on behalf of the plaintiff, appellee, cross-appellant with me at counsel table, is Mr. Streffling, Neil Streffling, who has lived this case much longer than I have. Let me just briefly, if I can, just talk about the last issue, that is the remediator. It was actually 4.25 million, which importantly was lower than Mr. Thomas' testimony, but higher than the testimony of plaintiff's expert. Judge Cohn was of the opinion that he had total discretion in determining what was an appropriate remitted amount. Judge Cohn was clearly wrong in doing that because Judge Cohn was guided by two principles that are very clear in this court. Number one, you have to give the most that the evidence would support, the most amount of money, and number two, you have to construe the evidence in the light most favorable to the plaintiff. Now, even if their major argument and Judge Cohn's major argument was Mr. Thomas could not testify to 5 million, which was, of course, above what the jury awarded, plaintiff's expert in this case testified to a value of slightly over 3 million, and Judge Cohn, because he was operating under his own discretion, and that's right in his decision in the case, picked 2 million. He was wrong. He did not have that discretion. Let me move on to the main point. So you're saying it's – I know you're challenging the remitted, but your position is that he just remitted it, remitted the damages too much. It should have been to, I guess, the 3 million that the other expert testified to. Yeah, but Judge Cohn made no mention of the plaintiff's expert in the case and what he testified to, and by the way, the plaintiff's expert used the same method of calculating as the defendant's expert. Judge Cohn simply disregarded it, and you can't do that in remittance. I'm not clear because Judge Mathis just asked you a question I don't think you answered. Is your position he should have kept it at 4.2, or if he remitted it, it should have been remitted to 3 million as a minimum? No, it should have been kept at 4.2 because that was below Mr. Thomas' testimony. I'm sorry. Okay, but if it was to be remitted, because his whole point was – I'm going to decide for the jury – But what's the basis for the 4.2? If we don't consider Mr. Thomas' testimony, what's the evidentiary basis for 4.2? Then it has to be the most – it could have been remitted to 3.008, what Mr. Reed – Now your answer is – I'm sorry, I'm trying to get clear. Again, in response to Judge Mathis, your answer is now that if he remitted it, it should have been to 3. Yes, it shouldn't have been remitted because Mr. Thomas' testimony was above the jury's award. But if he remitted it, the very lowest he could come was 3.008 because that was the testimony of plaintiff's expert, something that Judge Cohn completely ignored in coming to his conclusion. I hope that answers your question. Let me get to the big preclusion issues that have been raised in this case. There are obviously two different state court cases that could give rise to preclusion. The 2002 case that resulted in a jury decision in 2005. Judge Cohn got the issue in front of him, believe it or not, in 2012. So that was seven years after the jury – Right, that's because in 2008 you filed suit. Correct. In 2009 it goes back to state court. State court decides it, goes on appeal. Appellate court rules against you as well, and they say it's given preclusive effect. Just so I understand, you agree that January 1, 2009 is the taking state. That's the date you've always claimed, correct? That's what the jury decided. Okay, and you presented that to the jury, the jury found it, and damages are based on that. Correct. So January 1, 2009 is taking state. Correct. Okay. That case goes to the state court. State court decides, right or wrong, that the 2005 verdict bars that claim under raised judicata. Okay, but you have to tell me when does the state court decide that? I think it's March of 2009. You should know that better than me. You're not dealing with a hypothetical. I'm dealing with the real world. Okay, the state court, just so you know, the state court decided it in 2000, well, excuse me. The trial was in 2005, and the appeal was rejected a year later. No, no, no. You go back to state court in 2009.  State court rules against you, appellate court rules against you. They decide, seeing all those facts, that it's entitled to raised judicata effect. Then Judge Cohn on page 13 says, of his opinion, he says, without cite, that's not a decision on the merits. Yes. But Michigan law says it is a decision on the merits. Yes. Hold on. Rule 2.504 says anything that is anything other than jurisdictional is a decision on the merits. Then the Supreme Court of Michigan in, I think it's Washington v. Sinai, if I remember correctly, says decision on the merits. So Judge Cohn clearly got it wrong as to whether that's a decision on the merits. Why isn't that entitled to raised judicata effect? That's not because of something you mentioned to Ms. Mazarin when she was up here. I was going to get to the second case in terms of preclusive effect because that's obviously the more difficult one for you to decide. But it has to do with what Michigan law recognizes as an exception to raised judicata. And that is where something is against public policy or it is manifesting. So I've spent days, and can you give me a case in the last 15 years where they have held it? And can you give me your best case? Yes. The best case for this is Nick. No. It is the best case. Wait a minute. Wait a minute. So Michigan has a Supreme Court case called Schaefer that says decisional cases or not don't fit in the public policy or manifest injustice exception. In other words, subsequent decisions of any court do not create a manifest injustice or public policy. So if you look at the – Subsequent decisions, that's correct. But the fact is that plaintiff wanted a federal forum. Plaintiff was entitled to a federal forum. And plaintiff – I totally agree with you post-Nick. Plaintiff is entitled to a federal forum. Nick, it's 2019. Yes. This case was dealt with under the Williamson County regime. Every circuit in the country to have looked at this issue, 5th, 11th, 2nd, have all had this exact case come up and all said that doesn't matter. Well, it doesn't matter under Michigan law because remember it's Michigan law that controls under the Full Faith Inquiry Act. Then address Schaefer. The Michigan Supreme Court says no, that doesn't matter. Decisional cases don't matter for the public policy or manifest injustice exception. Later decisions don't matter. The plaintiff made an England reservation. The plaintiff said I want my federal claims tried in federal court. And I have a lot of sympathy for that. But you run into San Remo then. Well, no. San Remo obviously predates by 14 years the Nick case because the Nick case says this is a Catch-22 situation. Can I ask you something? If this appeal comes to us, just assume Judge Cohn and all the judges below were quicker, this appeal comes to us in 2015. Yes. Do you lose? On the issue of – Race Judicata. On the issue of Race Judicata based on the subsequent filing in state court, probably. I probably would lose. So the whole thing comes down to whether Nick creates – the whole issue in this case, there's one issue on Race Judicata. There's no issue regarding the 2002 case because as you mentioned – Wait, let me finish my question. There's one issue in this case and then I'll stop. There's one issue on the Race Judicata. And the issue is does Nick create a public policy or manifest injustice exception? Yes. Okay, great. Thank you. Maybe you should ask the Michigan Supreme Court that question because it's an important question. That's a different issue. That's a certification. Okay, go ahead. But the fact is, follow the Nick logic. The fact is that after – before Sam Remo, this court in DLX said, if you make an England reservation, you have defeated Race Judicata. Now Sam Remo obviously overruled DLX. But the fact is that the plaintiff in this case wanted a federal forum. The plaintiff was forced to leave the federal forum because the defendants made a motion. And by the way, the very motion that the defendants made in the district court in kicking this case on the basis of Williamson is contrary to their preclusion argument because they made the argument that these things had never gone through the state court system. They made that in the second filing. Okay. Well, their whole point here was these things haven't been litigated yet in the federal court. Okay? So how could the 2005 case have preclusive effect when they admitted that they hadn't been litigated? Which we can't do.  Okay, but the point is, again, that's why Nick is the most important case for me here. This is a catch-22, and the Supreme Court took them about 34 years to figure out. But they finally figured out that this was a catch-22 situation precisely because of an overbroad view. I shouldn't say overbroad. Because of a broad view of race and your color, which obviously Michigan adopts because Michigan adopts the rule that you can have not only issues that were raised but could have been raised. And there's no question the federal claims could have been raised in the 2009 state court case. There's no question. The plaintiff reserved the right. Why? Because the plaintiff had a right to a federal forum. And that's the central question presented with respect to the preclusive effect of the 2009 case. Any other questions that you might have on this? No. Thank you. Thank you. All right, rebuttal. Just briefly, and I think Pearson is one of the cases cited in our brief from the Michigan Supreme Court. The court rules that were mentioned in the questioning also support the notion that the decision was on the merits. And Brother Counsel conceded, as he properly had to, that the federal constitutional claims could have been raised in the state case. And that pretty much, in my view, means that race judicata must apply. I don't have other rebuttals. All right. Do you want to move on to the attorney fees appeal and cross appeal? Yes.  In our cross appeal, we argued that the attorney fees, the district court, because of what the district court characterized as severe and pervasive deficiencies in the entries, billing entries, and in the support for the attorney fees, the district court should have taken the opportunity to say, you don't get attorney fees at all. And why is that? The reason is because you have sophisticated lawyers who fully understand what the law is about, the showing that you have to make if you're a prevailing party. They fail to make that showing in their initial submissions. Even when the judge gave more time for the parties and accepted supplemental briefs and supplemental pleadings, they came back without any correction for the original problems of block billing and vague entries and so forth. And that put the district court in the position of doing one of two things. One would have been to say, hey, this just doesn't cut it. You're not getting attorney fees. We think that would have been the better result here and the required result because of those deficiencies. In addition, the party's agreement, as brother counsel argues, was not enough to give the district court a basis for the judgment. The parties talked about and tried to sort out the number of hours and the hourly rates, but never came to a full agreement about what was owed. And part of the reason was because there were lawyers that it wasn't clear who was doing what, so the district court couldn't even conclude this lawyer spent this number of hours, that lawyer spent that number of hours and had to do this sort of rough justice, which the district court was talking about. So how much in attorney fees do you say that they should have been awarded? None. None? Okay.  And I recognize . . . I thought there was some stipulation between counsel as to the hourly rate and also the number of hours. There were partial agreements carving out a number of hours and looking at hourly rates. Didn't you say $500,000 was reasonable below? I think we did. I think we also said they shouldn't be awarded at all, and the district court tried to take that into account. So there was an effort to reach an agreement. The agreement, there was no specific agreement, and at the time the district court looked at the question of attorney fees, the district court tried to take into account what the parties had said. Okay. Do you want to talk about the expert witness fees? Yes. The expert witness fees, in our view, are not properly awarded because the statute doesn't call for them. And also, we argued that the effort to collect on other cases was not properly . . . was properly excluded, which Brother Counsel disagrees with, on the basis of primarily the Binta case, Binta B. And the contention that attorney fees would only be awarded for work in this litigation based on the statute. Well, we couldn't get to this litigation, obviously, without going to state court. So how is this case different than, I believe it's Pennsylvania v. Delaware Valley, where, in that case, I think the parties had to go to the EPA to sort of protect the consent decree before coming to court, and the Supreme Court found that that was recoverable. I mean, here, obviously, I think you would agree they had to go to state court to exhaust those remedies before coming to federal court. I would say two things. First of all, the Supreme Court was looking at Title VII in that case and the particular requirements of that statute, and I don't think that . . . The way of cases, I think the Title VII case . . . Oh, okay. The Pennsylvania v. Delaware, that was a Clean Air Act or something along those lines. I think those cases differ because of those statutes, and I would differentiate this because what you're dealing with is not a statutory requirement, but you're dealing with the common law case law of the courts about how you establish a takings claim, and what the federal courts said before Williamson was you don't have a federal takings claim at all if the state compensates you for your property, and the only way we know whether the state will do so or not is if you proceed in state court. So that's not an . . . Under that theory or understanding of the claim, the state court action is about whether you're getting compensation for this property, and there is no federal claim until that's over. So that also supports the idea that you don't get to go back and pile those attorney fees onto these attorney fees. Okay. How about going to bankruptcy court? I mean, the bankruptcy court stayed this proceeding was going to discharge the claim and make HRT an unsecured creditor, and they say they had to go to bankruptcy court to preserve this claim, and why are they not entitled to attorney fees for that proceeding? They're not entitled for the same reason, because the statute that they're seeking to recover under says in this action, and the bankruptcy court proceedings might or might not have been necessary. I don't think the record here is completely clear on that, but it is other actions. They had no judgment, and it was not in this litigation. I think the Binta case does a good job of explaining that the purpose of the attorney fee statute 1988 is to assure that those who have valid constitutional claims can find a lawyer, not to provide a windfall to lawyers who've worked on litigation for years, as in this case, coming back and filing multiple suits one after the other. The way of balancing all of that, I'm putting it less well, I'm not putting it as well as Judge McKeague did in Binta, but the way of balancing all that is to say, no, we're not going to provide those attorney fees from the other. Is it your position that under 1983 you can never recover attorney fees for another proceeding, no matter how closely connected it is to the federal action, that there are no circumstances ever that you could go to another forum and recover those attorney fees, or is it just that this connection isn't enough? What's the rule? I think the rule in Binta is you only look at the litigation, this litigation. No, you can never, never, under your rule, never get attorney fees for another proceeding, no matter how necessary it is or ancillary it is for this one. I think that's the rule in Binta, and if the court were inclined to read Binta differently or go down that road, I think the connection here is not enough. Does that make sense? It does. I think it does. I think it absolutely does. I mean, the amount of attorney fees, even if you don't accept our view that the attorney fees submissions were so woefully deficient that the court should have said, no, we're not going to do rough justice. You had an obligation. You should have kept your billing. You should have corrected it when I called it to your attention. You didn't do it. But even if you get there, you still have a substantial amount of attorney fees in this litigation, and once you start looking at other related proceedings, it becomes very difficult as a matter of proofs, and it results in many times windfall. Okay. We'll give you some rebuttal. Mr. Granzato, do you want to argue the attorney fees for the HRT? My main question on this is that your client was awarded $42,000 in expert witness fees, and I don't see any authorization under 1983 for expert witness fees. I see the statute allowing expert witness fees in a 1981 action, but I don't see Congress authorizing it for 1983. Tell me, we're in the law. You're allowed to get the expert. I acknowledge 1988C and the fact that that was added and did not include expert fees under 1983 I have to acknowledge. The trial judge's basis for it was this court's decision in Waldo, which basically said that where there is work or expenses that are incidental and necessarily incurred in funding efficient representation of a client, they could be awarded. It was on the basis of your decision in the Waldo case. It obviously can't be justified on the basis of 1988. I acknowledge that. Let me talk briefly then about the defendant's position in this case. The defendant did not recommend $500,000. The defendant recommended $600,000, which is $77,000 less than was actually awarded, and the defendant's recommendation was based on a mathematical error because they recommended 200 hours per year for 10 years, and the document, coincidentally, in which they made that offer happened to be the exact 11th anniversary of the case. So if they were serious about their offer, it would have been $660,000, not $600,000, which is even closer to what the trial judge ultimately ended up with. And there are serious problems with what the trial judge did, even in arriving at the number that he did, but the fact is that what he awarded was not that far away from what the city was comfortable with. Ms. Masseron is now telling you they want zero. That is not the position they took in the district court. They, in fact, said $600,000, by far the most serious issue. Didn't they initially claim $300,000? No, they raised it up. Yeah, right, and then they said alternately $500,000, and then ultimately $600,000. 200 hours per year times 10 years is $300 an hour, $600,000. Right, that's what they ultimately did. That was in the supplemental briefing, though. Right. Okay, by far the more serious issues in the attorney fee questions here are in the cross-appeal, some very important issues that were raised here. Two very big mistakes, it seems to me, that I believe Judge Lawson made in his award. The first has to do with the questions you asked regarding tangential, if you will, litigation. And the trial judge gave the broadest possible reading to this court's opinion in Binta. And I do acknowledge there is, if you take a sentence or two from Binta, you could come to the conclusion that the trial judge arrived at. But the effect that the trial judge gave to Binta, it seems to me, cannot be harmonized with the Supreme Court's earlier decision in Webb. And, in fact, Binta qualified its own ruling, if you wanted to look for different language in Binta, it qualified its own ruling with respect to recoverable fees in other forms. And that part was ignored by the trial judge in this case. And to answer your question, Judge Griffin, the fact is that this court has on a number of occasions, and I have catalogs in my brief, rejected the idea that you can never collect fees in a 1983 or related cause of action for anything other than that particular action they are collecting. How necessary or closely related do the other proceedings have to be? What is the standard? You say there is a rule allowing you to collect attorney fees for other proceedings. But what connection is required? There are two answers I would give to you. The first is obviously derived from Webb, and that is if it's work that is useful and of a type ordinary and necessary to advance the civil rights litigation. Now, the two things that we're talking about – I'm sorry. Ordinary and necessary, is that the statement?  And obviously the bankruptcy was essential. The city declared bankruptcy, and the city wanted to discharge the debts. It was specifically addressed by Judge Rhodes in his opinion, and he rejected it. But HRT had to hire attorneys, or their civil rights case was over. And the second argument that I would propose to your question derives from the Kerry decision of the Supreme Court, because it applies to the other aspects of the attorney fees that we're claiming here, which is of course based on the 2009 cause of action that we were compelled to file in the state court. They asked you to file that, didn't they? They forced us to file it. They forced you to file it. It was their request or whatever. They said it was necessary for you to file it. Obviously, Williamson County rears its head again in this aspect of the case, and the fact is that this was a pure exhaustion requirement, and that's what Kerry was, obviously a Title VII case, and the administrative proceedings that were required in a Title VII case. But this was an equal exhaustion requirement. In fact, something that Nick ultimately called the Williamson County requirement as an exhaustion requirement, and I think I cited three or four cases from this court where they referred to the Williamson County diversion, if you will, to state court as an exhaustion requirement. So that's the one. Other litigation is a very important question presented in this case. The other thing that is of importance, it seems to me, in how Judge Lawson approached this, is that he had a hearing based on the original submissions, and by the way, the original submissions that the plaintiff made in the case are about 49 pages of the defendant's brief in this case. But the fact is he had a hearing, and he said, I can decide it now or I can let you guys try to work some things out, and they did. They took his advice, and they tried to work things out, and what they did was, number one, they segregated the hours because there was such a complaint made by the city. You were putting these, you know, the 2009 case, the bankruptcy case, and some other proceedings that had nothing to do with this case, and you roll them all together. Well, they submitted supplemental briefing to segregate them. So there was a specific number, an agreement as to which hours were spent on this case, and what Judge Lawson decided when he addressed the motion was, I can't accept these things. I have to lower it by one-third because you've given me all these numbers and you've rolled everything together. Well, by the time Judge Lawson decided this case, those numbers had been unrolled. They had, in fact, been segregated. That's the first mistake he made. The second mistake was perhaps more serious from HRT's perspective, and that is there was an agreement as to the hourly rate. There was an agreement as to hourly rate. There were 11 attorneys working on this case during the course of the 12 years it was in litigation. Of those 11 attorneys, I believe it was six, there was a complete agreement on the hourly rate. That was— The district court didn't have to accept that agreement, right? I'm sorry? The district court did not have to accept that agreement on the— Well, that's an interesting question. I think, and I've put this into my reply brief, he may not have— Well, I don't know if that's true because I've cited the law from this court that talks about when you make an admission as a party, wherever it is in the course of litigation, you're bound by it, and I think the city should have been bound by it because the city not only agreed on, I believe it's six of the lawyers, they also agreed on a range for the other five lawyers. That was an agreement. Why is the city not bound by the agreement they entered into at the behest of the trial court? I mean, maybe HRT and the defendants are bound by that, but why is the district court bound by it? You have to say that again. Why is the district court bound by that? I understand the parties may be bound by their own agreement, but the district court wasn't part of that agreement. Okay, but I think if the district court is going to deviate from something he told the parties to do, he owes us an explanation as to why. He should tell us. It's not just, as I pointed out in my brief, it's not just possessing discretion to decide on his own. It's exercising discretion, and he never said why he wasn't accepting the things that he asked the parties to do. He asked the parties, get together and work these out, and then he ignored it. I don't think that's correct. I do, in fact, think that's an abuse of discretion. He might be able to reject it, but tell me why. Are there any other questions? No. Thank you. Thank you. Rebuttal? Just very briefly, I tried to articulate this before in terms of the state court litigation. A couple of points. First of all, it's really ripeness, although sometimes called you have to exhaust, but the idea is the federal claim wasn't ripe until the state court proceedings were completed. Second, and Binta pointed this out, it's anomalous here. Brother counsel and HRT are seeking to recover fees from cases they twice lost in state court, which we think are controlling here, and now they want to go back and say, not only are you properly to ignore the counsel and decisions of the state court, but you're going to pay the attorney fees of the losing side, and that was one of the reasons that Judge McKeague in Binta said, we're only going to look to hours and attorney fees from this lawsuit. Related to that is the bankruptcy. The trial court said he looked. There were no cases in which bankruptcy fees were awarded, and also you don't get fees in bankruptcy proceedings ordinarily. It's under the normal rule, the American rule of each side pays their own fees, and there's nothing in this statute that would suggest it was intended to override that. Well, they're not asking the bankruptcy court to award them attorney fees. They're asking the district court in the 1983 action, and the cases you cite for bankruptcy court are all bankruptcy awards or not by the bankruptcy court, right? I apologize. I should know if they were bankruptcy court only or Section 1983. I'm sure we cited cases saying you don't get fees in bankruptcy court. I agree with you on that, but that's not what we're talking about. I think the district court said the district court could not find any case in which bankruptcy fees had been awarded in a 1983 action under 1988. Why doesn't it make sense to award attorney fees for the actions in bankruptcy court when it's necessary to not have the claim discharged in bankruptcy? That's the only way that you can proceed with the existing litigation in federal court. Why doesn't it make sense? Because the statute doesn't call for that. All right, because it's not statutorily allowed. Correct. Okay. Correct. If I could make one final point, Brother Counsel repeatedly suggests that if there's an agreement, the district court, even if it's not bound or maybe it's bound, would have to explain why the court disregarded it, and the district court did that on the bottom of page 13 of the opinion involving attorney fees. The district court said the approval of specific rates is problematic because it's impossible to determine reliably the number of hours each attorney spent on the litigation, and thus the varying rates don't help in coming up with a number. So if the court concludes that we prevail, of course, the whole issue of attorney fees will not need to be decided. But if the court concludes that it affirms the judgment, then we would urge for the reasons I've stated and the reasons in our brief that the attorney fees not be awarded, or at a minimum that the judge's opinion of the amount be affirmed rather than awarding something more. Very well. Any further questions? All right. Thank you, Counsel, for your excellent arguments.